D I F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

CHRISTINA A. SELVAGGIO,

                           Plaintiff,

           -against-

POLICE OFFICER ANAIDA PATTERSON,
POLICE OFFICER ROBIN LESTRADE,
SERGEANT WALSH, and THE CITY OF
NEW YORK,

                           Defendants.
-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**13-CV-2436 (NGG) (RML)**

NICHOLAS G. GARAUFIS, United States District Judge.

Pro se Plaintiff Christina A. Selvaggio brings this action against three employees of the

New York City Police Department ("NYPD")—Police Officer ("P.O.") Anaida Patterson, P.O.

Robin Lestrade, and Sergeant Walsh (collectively, the "Individual Defendants")—and the City of

New York (the "City"). Pursuant to 42 U.S.C. § 1983, she asserts claims of false arrest,

excessive force, and municipal liability in connection with her April 6, 2012, arrest.[1] Defendants

have moved for summary judgment on all claims. For the reasons explained below, Defendants'

motion is GRANTED IN PART and DENIED IN PART.

## I.   BACKGROUND

### A.   Facts

Except as otherwise noted, the following facts are undisputed. Where facts are in

dispute, the courts credits Plaintiff's version of the facts.[2]

---

[1]  Plaintiff's pro se Complaint (Dkt. 1) does not make explicit that she asserts these three claims; however, the court believes that Defendants are correct to have so construed Plaintiff's claims in their motion for summary judgment.

[2]  Plaintiff addressed the facts asserted in Defendants' Rule 56.1 Statement (Dkt. 36) in her own opposing statement as required by Local Civil Rule 56.1 (see Pl.'s Rule 56.1 St. ("Pl.'s 56.1") (Dkt. 41)); however, she did not assert additional material facts therein, but did so instead through her opposing memorandum (Pl.'s Mem. in Opp'n ("Pl.'s

On December 6, 2011, Plaintiff's husband, Larry Mansour ("Mansour"), filed a domestic

incident report against Plaintiff (the "2011 DIR").[3] (Decl. of Rosemari Y. Nam in Supp. of

Defs.' Mot. for Summ. J. ("Nam Decl."), Ex. A (Dkt. 37-1); see also Defs.' Rule 56.1 St.

("Defs.' 56.1") (Dkt. 36) ¶ 1; Pl.'s Rule 56.1 St. ("Pl.'s 56.1") (Dkt. 41) at ¶ 1.) In the 2011

DIR, Mansour stated that Plaintiff "accused me of stealing her [truck and mailbox] keys and of

giving said keys to a person named Phyllis March." (2011 DIR at 3.) He asserted that he was

"harassed and treated with mental cruelty on a daily basis." (Id.) He further stated that Plaintiff

"has our window screens bolted shut and a special lock on our front & back door that you . . .

cannot open without the key. I do NOT have a key. She often goes out & locks me in so I can't

'sneak out.'" (Id. (emphasis in original).) The 2011 DIR states that no arrest was made, and

gives as a reason: "no offense committed." (Id. at 1.) The reporting officer for the 2011 DIR

was non-party Damon Plonczynski; the 2011 DIR also indicates that it was reviewed by non-

Opp'n") (Dkt. 43)), a declaration (Decl. of Christina A. Selvaggio in Opp'n of Defs.' Mot. for Summ. J. ("Selvaggio Decl.") (Dkt. 42)), and additional exhibits (Selvaggio Decl., Exs. 1-10 (Dkts. 42-1 to -10)). Cf. Local Civil Rule 56.1(b). Because Plaintiff is proceeding pro se, the court has performed an independent review of the entire record submitted by the parties to determine whether there are disputed issues of material fact. See McClendon v. Cnty. of Nassau, No. 11-CV-0190 (SJF) (ETB), 2012 WL 4849144, at *2 (E.D.N.Y. Oct. 11, 2012); Williams v. City of New York, No. 06-CV-6601 (NGG), 2009 WL 3254465, at *1 n.1 (E.D.N.Y. Oct. 9, 2009). The court treats Plaintiff's notarized filings such as her opposition memorandum and her Complaint (Dkt. 1) as sworn statements. See Washington v. William Morris Endeavor Entm't, LLC, No. 10-CV-9647 (PKC), 2014 WL 4401291, at *1 n.1 (S.D.N.Y. Sept. 5, 2014); Geldzahler v. N.Y. Med. Coll., 746 F. Supp. 2d 618, 620 n.1 (S.D.N.Y. 2010).

[3] Plaintiff argues that the 2011 DIR should be excluded from evidence because the police report from her arrest indicates that she was arrested pursuant to a domestic incident report that was filed by Mansour on April 2, 2012 (the "2012 DIR"), and it does not mention the 2011 DIR. (See Pl.'s Rule 56.1 St. ("Pl.'s 56.1") ¶ 1; Decl. of Christina A. Selvaggio in Opp'n of Defs.' Mot. for Summ. J. ("Selvaggio Decl.") ¶¶ 3, 8; Pl.'s Opp'n at 4; Mot. in Limine (Selvaggio Decl., Ex. 5 (Dkt. 42-5)); see also Pl.'s Arrest Report (Nam Decl., Ex. F (Dkt. 37-6)) at 1.) Plaintiff argues that the 2011 DIR could not have contributed to providing probable cause for her arrest. (Pl.'s 56.1 ¶ 1.) As explained below, see infra Part III.A.1, the court need not determine the ultimate admissibility of the 2011 DIR upon this motion, as it finds that summary judgment on Plaintiffs' false arrest claim should be denied even when taking it into account.

2

party Vincent DeMarco on December 7, 2011, and that on December 13, 2011, Defendant Sergeant Thomas Walsh signed off on the report.[4] (Id. at 2.)

On April 2, 2012, Mansour filed a second domestic incident report against Plaintiff (the "2012 DIR"). (Nam Decl., Ex. B (Dkt. 37-2); see also Defs.' 56.1 ¶ 5; Pl.'s 56.1 ¶ 5.) In the 2012 DIR, Mansour reported that Plaintiff accused him of sneaking his "alleged 'mistress'" into his bedroom, "even though [Plaintiff] has the key to a dead bolt lock which locks both from the inside and the outside and of which I have no control over and in spite of the fact [Plaintiff] has all the screens on all the windows screwed-shut to disallow their being able to be opened . . . ." (2012 DIR at 3.) The 2012 DIR states that Mansour was "fearful," and that Plaintiff had a history of abusing drugs or alcohol (see id. at 1); however, at his deposition, Mansour testified that he was never asked such questions by the reporting officer. (Mansour Dep. (Dkt. 48-2)[5] at 45:5-21, 47:1-12.) The 2012 DIR further states that no arrest was made, and gives as a reason: "no offense committed." (2012 DIR at 1.) The reporting officer for the 2012 DIR was again non-party Damon Plonczynski; the 2012 DIR also indicates that it was reviewed by Defendant P.O. Anaida Patterson on April 5, 2012, and that Sergeant Walsh signed off on the report on April 6, 2012. (Id. at 2.) The 2011 and 2012 DIR forms that Mansour signed provide that "False

---

[4] Sergeant Walsh has been the head of the Domestic Violence Unit since November 2011. (See Def. Sgt. Walsh's Resp. & Obj. to Pl.'s Interrogs. (Decl. of Christina A. Selvaggio in Opp'n Defs.' Mot. for Summ. J. ("Selvaggio Decl."), Ex. 9 (Dkt. 42-9)) at 5 (Obj. & Resp. to Interrog. No. 7).)

[5] Defendants submitted excerpts from the transcript of Plaintiff's deposition; however, Defendants' submission did not contain page 22 of the deposition. (See Selvaggio Dep. Excerpts (Nam Decl., Ex. D (Dkt. 37-4)).) Plaintiff submitted page 22 as an attachment to a letter dated July 28, 2014. (Dkt. 46.) With her opposition papers, Plaintiff submitted a single page from the transcript of Larry Mansour's deposition. (See Mansour Dep. Excerpt (Decl. of Christina A. Selvaggio in Opp'n of Defs.' Mot. for Summ. J. ("Selvaggio Decl."), Ex. 10 (Dkt. 42-10)).) Per the court's request, counsel for Defendants subsequently submitted the (nearly) complete transcripts of these two depositions, and the court cites to these transcripts in this Memorandum and Order. (See Selvaggio Dep. (Dkt. 48-1); Mansour Dep. (Dkt. 48-2).) Although page 58 was omitted from the "complete" version of Plaintiff's deposition transcript, this page is available for review in the excerpt previously submitted by Defendants, and the court has indeed reviewed the entire transcripts of both depositions.

3

Statements [] are punishable as a Class A Misdemeanor, pursuant to section 210.45 of the Penal Law." (Defs.' 56.1 ¶ 7; Pl.'s 56.1 ¶ 7; 2011 DIR at 3-4; 2012 DIR at 3.)

Plaintiff had filed her own DIR against Mansour the previous day, on April 1, 2012 ("Pl.'s DIR"). (Decl. of Christina A. Selvaggio in Opp'n of Defs.' Mot. for Summ. J. ("Selvaggio Decl."), Ex. 6 (Dkt. 42-6); see also Pl.'s Mem. in Opp'n ("Pl.'s Opp'n") (Dkt. 43) at 6.)[6] In Plaintiff's DIR, she stated that she and Mansour had a "verbal dispute," and Mansour "pushed her out of the room" and "slammed her right elbow and robe in door" while closing the door. (Pl.'s DIR.) Mansour avers that the purpose of the 2012 DIR, which he filed the day after Plaintiff's DIR, was "merely . . . to give my side of the story. In addition, I wanted to tell them why we fought the night before, which was because of allegations of cheating. I wanted to know that I can't possibly be cheating . . . ." (Mansour Aff. (Selvaggio Decl., Ex. 7 (Dkt. 42-7)) at ¶ 1; see also Pl.'s Opp'n at 8.) He writes that he "made [this purpose of the 2012 DIR] clear to Officer Plo[nc]zynski." (Mansour Aff. ¶ 1.)

When Mansour went to the precinct to file the 2012 DIR, Plaintiff followed after him in order to file yet another complaint against Mansour, regarding an incident that had occurred that morning, during which "Mansour was yelling and cursing at my Mother and he tried to bum rush her, as well." (Pl.'s Opp'n at 7.) Plaintiff further alleges that while she and Mansour were at the precinct on April 2, 2012, apparently yelling at each other (see id. at 8), P.O. Plonczynski shouted: "'[S]hut up, shut the 'F' up and get a divorce already, stop filing hundreds of complaints.'" (Id. at 8; see also Mansour Dep. at 27:17-28:9 ("Officer [Plonczynski] was screaming at the top of his lungs . . . and with a face wrenched with anger. Shut the fuck up.

---

[6] Plaintiff reports that she has filed "multiple complaints against Larry Mansour, all which went unanswered and not investigated." (Pl.'s Opp'n at 8.) According to Mansour, he and Plaintiff had also filed numerous complaints against the former owner of their home, Phyllis March, regarding alleged harassment and/or stalking. (See Mansour Dep. at 29:23-31:21.)

Stop coming in here and filing all these—stop coming in here and filing hundreds of complaints. . . . I'm tired of all this fuckin' bullshit. This has to fuckin' stop."); Mansour Aff. at 6.) Mansour asserts that Sergeant Walsh also said to him: "'She's a F--k--g psycho. You look like a smart guy, get rid of her. Just move out. Don't pay the mortgage. Let her . . . live in the street.'" (Mansour Aff. at 6; see also Mansour Dep. at 29:8-22.) Mansour claims that he responded to Sergeant Walsh's comments by affirming his love for Plaintiff and Plaintiff's right to question him and his loyalty. (See Mansour Aff. at 6.) After they completed filing their respective complaints, Plaintiff and Mansour returned home. (Pl.'s Opp'n at 8.)

Four days later, on April 6, 2012, Defendants Patterson, Walsh, and Lestrade arrived at Plaintiff's residence. (Defs.' 56.1 ¶ 8; Pl.'s 56.1 ¶ 8.) Walsh asked if the officers could enter the home, and Plaintiff and/or Mansour allowed them inside. (See Compl. (Dkt. 1) at 1.) Walsh observed screws in the window screens, a lock on the back door, and a dead bolt lock on the front door; he photographed all three.[7] (Defs.' 56.1 ¶¶ 9-10, 12; Pl.'s 56.1 ¶¶ 9-10, 12; see also Evid. Photos. (Nam Decl., Ex. E (Dkt. 37-5)).) At the time, the key to the front door dead bolt

---

[7] Plaintiff argues that Walsh lacked both a search warrant and arrest warrant at the time and that she did not give him permission to take the photographs. (Pl.'s 56.1 ¶¶ 6, 8.) Defendants note in their reply brief that Plaintiff did not allege in her Complaint that Walsh unlawfully searched her home or seized evidence, and that she did not express any resistance to Walsh's entering the home or taking of photographs. (See Defs.' Reply (Dkt. 44) at 12.) The Complaint states that Walsh asked Plaintiff and/or Mansour if the officers could enter, and suggests strongly that they gave consent to the entry and subsequent conversation. (See Compl. at 1.) The court agrees that Plaintiff failed to raise any claim contesting Defendants' entry into her home or taking of photographs, and she cannot add such a claim at this stage of the litigation.

To the extent Plaintiff contends that the photographs are inadmissible pursuant to the exclusionary rule, the court disagrees—there is no indication of an illegal search in any of Plaintiff's filings. It appears that Plaintiff voluntarily permitted Defendants to enter the home. After entering the home, the officers were entitled to photograph objects in their plain view, and they were also permitted to photograph evidence they viewed from outside the residence, such as the window screens. See Wilson v. Supt., Attica Corr. Facility, No. 00-CV-0767 (NAM) (GLS), 2003 WL 22765351, at *8 (N.D.N.Y. Nov. 24, 2003) (report and recommendation) (holding that "photographs taken of items outside [defendant's] apartment that were in plain view of the officer" were properly admitted), adopted, Order, 00-CV-0767 (NAM) (GS) (N.D.N.Y. Feb. 4, 2004), ECF No. 28; cf. United States v. Espinoza, 641 F.2d 153, 167 (4th Cir. 1981) ("[The law enforcement agent] did not exceed the scope of the warrant by making the photographs of what he saw in plain view and to that extent 'seizing' those views themselves as evidence."). Thus, the photographs are admissible as relevant evidence. See Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."); Fed. R. Evid. 402 (providing that relevant evidence is generally admissible).

lock was placed in the lock. (See Evid. Photos.; Pl.'s 56.1 ¶ 10.) Sergeant Walsh asked Plaintiff whether Mansour had a key to the locks, and she stated that he did not. (Defs.' 56.1 ¶ 11; Pl.'s 56.1 ¶ 11; Compl. at 2.) Plaintiff alleges that when Walsh asked this question, she explained that Mansour did not have a key "'only because he don't want one and I only lock it when we all go out.'" (Compl. at 2.) In his deposition, Mansour testified that he confirmed Plaintiff's statement. He informed Sergeant Walsh: "I don't have a copy of the key because I told my wife I don't want a copy of the key. I don't need a copy of the key. We lock it when we go out and I don't need it." (Mansour Dep. at 48:10-13.) Mansour also testified that he explained to Walsh the purpose of the screws in the window screens: "I made it clear to him, I said they were put there by [Plaintiff's] friend because they were streaking—they weren't solid. They weren't firm within there. They could fall out. Bugs coming in. We did it to stop bugs from coming in and the ones downstairs we did it so people can't come in and bugs, too. It's harder to break in through the second floor but the ground floor very very easy." (Id. at 47:18-25.)

Mansour also told Walsh that he did not want Plaintiff to be arrested. (Def. Sgt. Walsh's Resp. & Obj. to Pl.'s Interrogs. (Selvaggio Decl., Ex. 9 (Dkt. 42-9)) at 9 (Obj. & Resp. to Interrog. No. 19); Mansour Aff. ¶ 3.) In his affidavit, Mansour states, "I pleaded with Sergeant Walsh that I did not file a complaint against my wife for false imprisonment because I'm not falsely imprisoned," and "I pleaded with him not to arrest [Plaintiff], because that's not what I reported, or, what I wanted." (Mansour Aff. ¶ 3; see also Mansour Dep. at 34:2-10 ("I said . . . I filed a complaint that my wife accused me of adultery. I said my wife was not guilty of false imprisonment. My wife didn't commit a crime. My wife sh[oul]d not be arrested. I do not want her to be arrested. It was my intent to give my version of the story. I said my wife should not be arrested. . . . I said my wife did nothing at any time without my knowledge and without my

6

approval.").) However, Defendants contend that when Plaintiff was no longer present, Mansour stated that he "was fearful of [P]laintiff and has no way to leave the house."[8] (Def. Sgt. Walsh's Resp. & Obj. to Pl.'s Interrogs. at 9 (Obj. & Resp. to Interrog. No. 19).)

After Walsh informed her that she was about to be arrested, Plaintiff went upstairs to change her clothing, and she was accompanied by Patterson. In her deposition, Plaintiff testified that Patterson "whispered to me and Larry, . . . 'I am sorry, it is not me, it is him, it is my boss,' and she is pointing at Thomas [Walsh]." (Selvaggio Dep. at 23:15-18; see also Mansour Aff. ¶ 4; Compl. at 1-2 ("[S]he whispered to Larry and I that it wasn't the State that was doing it, it was her boss Sergeant Walsh, who wants it.").) Patterson told them Plaintiff would "be coming home tonight, because the District Attorney probably won't press charges and send her home, if we get there quickly." (Compl. at 1-2; see also Mansour Aff. ¶ 4.)

Plaintiff was placed under arrest for Unlawful Imprisonment pursuant to New York Penal Law section 135.05. (Defs.' 56.1 ¶ 13; Pl.'s Arrest Report (Nam Decl., Ex. F (Dkt. 37-6)) at 1.) Patterson handcuffed Plaintiff behind her back, placed her in the back seat of the car, and secured the seatbelt; at some point while Plaintiff was in the police car, she unbuckled her own seatbelt. (Defs.' 56.1 ¶¶ 14, 16; Pl.'s 56.1 ¶¶ 14, 16; Compl. at 2.) Plaintiff claims that she was not provided with Miranda warnings at this time; she did not receive them until approximately an hour after she had already arrived at the police station. (Pl.'s 56.1 ¶ 13; Compl. at 2; Pl.'s Opp'n at 11.)[9] Plaintiff alleges that both the seatbelt and handcuffs were too tight, so that when the

---

[8] Mansour further asserts that he no longer feels comfortable driving due to side effects of prostate cancer treatment and that "since [Plaintiff] drives me everywhere I need to go, I don't need or want a key." (Mansour Aff. ¶ 2.)

[9] To the extent that Plaintiff attempts to assert a § 1983 claim based on the officers' failure to provide Miranda warnings, the claim fails because there is no constitutional right to receive Miranda warnings. See Deshawn E. ex rel. Charlotte E. v. Safir, 156 F.3d 340, 346 (2d Cir. 1998). Defendants are correct in arguing that the remedy for any violation of the Fifth Amendment right against self-incrimination is "'the exclusion from evidence of any ensuing self-incriminating statements' and 'not a § 1983 action.'" Id. (quoting Neighbour v. Covert, 68 F.3d 1508, 1510 (2d Cir. 1995)).

handcuffs were removed she suffered abrasions on her wrists, and she had a headache. (Defs.' 56.1 ¶ 15; Pl.'s 56.1 ¶ 15; Selvaggio Dep. at 25:23, 26:3-4, 27:4-12, 54:8-18.) En route to the precinct, Plaintiff told the officers that the handcuffs and seatbelt were too tight; when asked if she wanted to go to the hospital, Plaintiff declined, and stated that she simply wanted them to be loosened. (Compl. at 2.) Plaintiff alleges that Patterson pretended to loosen the handcuffs but did not in fact do so. (Id.) Plaintiff also testified that she repeatedly asked the officers to loosen the handcuffs, and that Patterson responded that Plaintiff was too thin, and she might come out of the handcuffs if they were loosened. (Selvaggio Dep. at 26:1-9, 19-20.)

In her opposition memorandum, Plaintiff contends that she experienced "more than pain and red marks. There was scabbing that lasted approximately one week." (Pl.'s Opp'n at 27.) Defendants argue that this is contradicted by Plaintiff's deposition testimony, in which Plaintiff stated that she had "minimal physical injuries," which she identified as "abrasions," and could not recall how long the abrasions lasted.[10] (Selvaggio Dep. at 53:24, 56:8-18; Defs.' Mem. in Supp. ("Defs.' Mem.") (Dkt. 38) at 3.) Plaintiff further claims that when they arrived at the precinct, Patterson "had a difficult time, removing the handcuffs," and that Patterson and Lestrade "continuously twisted and wiggled [the handcuffs] around [Plaintiff's] wrists," struggling to remove them, and that after the handcuffs were removed, Plaintiff was handcuffed to a bar. (Pl.'s Opp'n at 11.)

After being detained at the precinct for several hours, Plaintiff was released without charges. (Defs.' 56.1 ¶ 17; Pl.'s 56.1 ¶ 17.) She drove herself to the hospital that evening.

---

[10] Defendants argue that Plaintiff did not allege any "scabbing" in her deposition or Complaint, and that Plaintiff's opposition memorandum thus improperly attempts to raise an issue of fact by contradicting Plaintiff's own prior testimony. (Defs.' Reply (Dkt. 44) at 8 (citing Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996); Perma Res. & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)).) In the court's view, abrasions and scabbing are sufficiently interchangeable injuries, and the court will consider the facts asserted in Plaintiff's opposition papers, as well as her deposition testimony.

(Defs.' 56.1 ¶ 17; Pl.'s 56.1 ¶ 17; Selvaggio Dep. at 54:24-55:3.) Plaintiff states that she went to the hospital because of both "a bad headache and abrasions on both wrists." (Pl.'s 56.1 ¶ 18.) At the hospital, Plaintiff was given medication for a headache—pills, which she testified that ultimately she did not take, due to a heart condition. (Defs.' 56.1 ¶ 17; Pl.'s 56.1 ¶ 17; Selvaggio Dep. at 55:17-21.) Plaintiff received no treatment for her wrist abrasions at the hospital; no MRIs or X-rays were taken of Plaintiff's wrists, and no additional medical treatment (other than the prescribed but untaken pills) was ever required with respect to either Plaintiff's wrist abrasions or headache. (Defs.' 56.1 ¶¶ 19-22; Pl.'s 56.1 ¶¶ 19-22.) Plaintiff also asserts that she suffers from emotional injuries caused by the incident, although she has not received any treatment for psychological or emotional damage. (Selvaggio Dep. at 60:4-6, 15-17.)

At her deposition, Plaintiff testified that she named the City as a Defendant in this lawsuit "[b]ecause they employ [the Individual Defendants] and they are responsible for their actions." (Selvaggio Dep. at 70:21-22.) In her Rule 56.1 Statement, Plaintiff contends that she "is suing the City of New York because they failed to properly train and supervise Sergeant Walsh, Officer Patterson and Officer Lestrade." (Pl.'s 56.1 ¶ 23.)

In discovery, Defendants produced a list containing all Internal Affairs Bureau ("IAB") and Civilian Complaint Review Board ("CCRB") substantiated and unsubstantiated allegations made against the Individual Defendants related to false arrest, false statements, and dishonesty for the ten-year period ending April 6, 2012. (See Defs.' Reply (Dkt. 44) at 14; Individual Defs.' IAB and CCRB Records ("Discip. Records") (Selvaggio Decl., Ex. 8 (Dkt. 42-8)).) Apart from those apparently filed by Plaintiff related to her April 6, 2012, arrest, three such allegations were made against Walsh during that time period: (1) an open IAB allegation of an off-duty arrest from August 30, 2004; (2) a substantiated IAB allegation of "Memobook Incomp/improp" that

occurred April 7, 2011; and (3) a CCRB allegation of "other misconduct" that occurred on April 7, 2011. (Discip. Records at 2-6.) Two allegations were lodged against Lestrade: (1) an open IAB allegation of a July 18, 2006, disputed arrest; and (2) an open IAB allegation of "Investigate Incomp/Improp" from February 5, 2010. (Id. at 11-13.) There were no allegations made against Patterson during that time period aside from those apparently filed by Plaintiff. (See id. at 7-10.)

## B.    Procedural History

Plaintiff filed her Complaint against P.O. Lestrade, P.O. Patterson, Sergeant Walsh, and the NYPD on April 19, 2013. (Compl.) The court sua sponte dismissed all claims against the NYPD, a non-suable entity, on June 6, 2013. (Order (Dkt. 4).) On October 3, 2013, the court granted Plaintiff's motion to amend the Complaint to include the City as a party, on the City's consent. (Order (Dkt. 16).) No motion to dismiss was filed; Defendants answered the Amended Complaint on October 12, 2013. (Answer to Am. Compl. (Dkt. 17).) Discovery proceeded before Magistrate Judge Robert M. Levy. On February 12, 2014, Plaintiff moved the court to exclude from evidence two documents that were produced to her in discovery: (1) the 2011 DIR, and (2) an undated memorandum related to her arrest and addressed to an Assistant District Attorney. (Mot. in Limine (Dkt. 20).) The court denied Plaintiff's motion in limine without prejudice as premature. (Mar. 28, 2014, Order (Dkt. 25).)

Defendants sought permission to file a motion for summary judgment. (Mot. for Pre-Mot. Conf. (Dkt. 24).) With leave of court, Defendants filed their fully briefed motion on July 23, 2014. (Mot. for Summ. J. (Dkt. 34).) Plaintiff opposed the motion. (See Pl.'s Opp'n.)[11]

---

[11] Plaintiff subsequently submitted several letters to the court, taking issue with defense counsel's request for an extension of time to serve and file Defendants' reply memorandum and for additional pages, and also reiterating certain arguments from her opposition papers. (See July 24, 2014, Ltr. (Dkt. 45); July 30, 2014, Ltr. (Dkt. 46); see also Feb. 23, 2015, Ltr. (Dkt. 51).) Although the court has previously cautioned defense counsel regarding the

## II.  LEGAL STANDARD

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  No genuine dispute of material fact exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the court "is required to construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor." Trammell v. Keane, 338 F.3d 155, 161 (2d Cir. 2003); see also Anderson, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

The moving party bears the initial burden to show an absence of genuine factual dispute. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).  Summary judgment will be granted if the opposing party then "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  To defeat summary judgment, the opposing party must do more than demonstrate "some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, and may not rely on "conclusory allegations." Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 568 (2d Cir. 1990).  Where the party opposing summary judgment is proceeding pro se, the court must construe its filings liberally. See Ferran v. Town of Nassau, 471 F.3d 363, 369 (2d Cir. 2006).

---

importance of using care in filing court documents (Jan. 22, 2015, Order (Dkt. 47)), the court does not believe that defense counsel has willfully acted in disregard of pro se Plaintiff's rights, and Plaintiff's complaints to the contrary do not affect the court's analysis in the instant Memorandum and Order.  The court has fully considered Plaintiff's substantive arguments, including those in her letters, in consideration of this motion.

## III.   DISCUSSION

### A.   False Arrest

Defendants argue that Plaintiff's false arrest claim must be dismissed because probable cause for her arrest existed as a matter of law; and that, in the alternative, the Individual Defendants are entitled to qualified immunity as to Plaintiff's false arrest claim. As explained below, the court cannot agree on the current record. Accordingly, Defendants' motion for summary judgment is DENIED as to Plaintiff's claim of false arrest.

#### 1.   Admissibility of 2011 DIR

Plaintiff argues that the 2011 DIR should be excluded from evidence because the police report from her arrest indicates that she was arrested pursuant to the 2012 DIR, and it does not mention the 2011 DIR. (See Pl.'s 56.1 ¶ 1; Selvaggio Decl. ¶¶ 3, 8; Pl.'s Opp'n at 4; Mot. in Limine (Pl.'s Ex. 5 (Dkt. 42-5)); see also Pl.'s Arrest Report (Nam Decl., Ex. F (Dkt. 37-6)) at 1.) In his interrogatory responses, Sergeant Walsh stated that he went to Plaintiff's residence on April 6, 2012, to follow up on the 2012 DIR. (Def. Sgt. Walsh's Resp. & Obj. to Pl.'s Interrogs. at 5 (Obj. & Resp. to Interrog. No. 9).) Plaintiff argues, therefore, that the 2011 DIR could not have contributed to providing probable cause for her arrest. (Pl.'s 56.1 ¶ 1.) She appears to claim that it is inadmissible because it is irrelevant. Cf. Fed. R. Evid. 402 (relevant evidence is generally admissible).

Defendants argue that the "details portion of the NYPD Arrest Forms does not always contain an all-inclusive summary." (Defs.' Reply at 2 n.2 (citing Def. Sgt. Walsh's Resp. & Obj. to Pl.'s Interrogs. at 3-4 (Obj. & Resp. to Interrog. No. 4)).) As Defendants also note, the 2011 DIR indicates that Sergeant Walsh signed off on the report on December 13, 2011 (see 2011 DIR at 2), and Sergeant Walsh stated in his interrogatory responses that "upon information and belief,

12

he personally reviewed and signed off" on the 2011 DIR (Def. Sgt. Walsh's Resp. & Obj. to Pl.'s Interrogs. at 2 (Obj. & Resp. to Interrog. No. 1)). Defendants contend, therefore, that "one of the facts confronting Sergeant Walsh at the time of [P]laintiff's arrest for false imprisonment" was the 2011 DIR. (Defs.' Reply at 2 n.2.)

Although the standard for probable cause is an objective one, and does not depend upon an officer's subjective motivations, Whren v. United States, 517 U.S. 806, 813 (1996); United States v. $577,933.89, More or Less, in U.S. Funds, 287 F.3d 66, 85 (2d Cir. 2002) (Sotomayor, J.), the facts purportedly providing probable cause must be known to the officer or officers at the time of the arrest. See Devenpeck v. Alford, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."); id. at 153 ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."). Given Walsh's interrogatory response that he went to Plaintiff's residence on April 6, 2012, to follow up on the 2012 DIR, and the passage of time between the date that Defendant Sergeant Walsh apparently reviewed and signed off on 2011 DIR and the date of Plaintiff's arrest, especially where Walsh has stated "on information and belief" that he did so, there may be an open question of fact regarding whether Walsh indeed "knew" the information contained in the 2011 DIR at the time of Plaintiff's arrest. However, the court need not determine at this point whether the 2011 DIR is ultimately admissible or not. The court assumes for purposes of this motion, without deciding, that the 2011 DIR is admissible, because summary judgment is denied as to Plaintiff's false arrest claim even considering the 2011 DIR. At a future trial, Defendants may be required to lay a foundation of such knowledge before the 2011 DIR will be properly admitted into evidence. See Fed. R. Evid. 104(b).

13

## 2.    Probable Cause

Plaintiff's § 1983 false arrest claim stems from the Fourth Amendment right to be free from unreasonable searches and seizures, which includes the right to be free from arrest absent probable cause.[12]  See Jaegly v. Couch, 439 F.3d 149, 151 (2d Cir. 2006).  Accordingly, the existence of probable cause is an absolute defense to a false arrest claim.  Id. at 152; Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).  It is Defendants' burden to establish the existence of probable cause.  See Dickerson v. Napolitano, 604 F.3d 732, 751 (2d Cir. 2010) ("When an arrest is not made pursuant to a judicial warrant, the defendant in a false arrest case bears the burden of proving probable cause as an affirmative defense." (quoting Broughton v. State, 335 N.E.2d 310, 315 (N.Y. 1975))); Jenkins v. City of New York, 478 F.3d 76, 88 (2d Cir. 2007) (under New York law, an arrest made without a warrant is presumed unlawful unless the officer can prove the existence of probable cause).

Probable cause exists when, based on the totality of the circumstances, the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  Id.; see also Dunaway v. New York, 442 U.S. 200, 208 n.9 (1979); Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004).  Determining whether probable cause exists requires an objective assessment of the facts known to the officer at the time of arrest.[13]  See Devenpeck, 543 U.S. at 152-53; Finigan v. Marshall, 574 F.3d 57, 61-62

---

[12]  A false arrest claim under § 1983 is substantially similar to a claim for false arrest under New York law.  See Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).  Under New York law, to prove the elements of false arrest, a plaintiff must show: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged."  Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994).  Only the last element is in dispute here.

[13]  Pursuant to the collective knowledge doctrine, facts known to one member of a law enforcement team cooperating in an investigation are presumed to be shared by the others when determining the existence of probable cause to arrest.  See Savino v. City of New York, 331 F.3d 63, 74 (2d Cir. 2003).  Accordingly, any facts that were

14

(2d Cir. 2009). Accordingly, "[s]ubjective intentions" of the arresting officer "play no role in ordinary, probable cause Fourth Amendment analysis." Whren, 517 U.S. at 813; see also $577,933.89, More or Less, in U.S. Funds, 287 F.3d at 85 ("[T]he determination of probable cause is an objective one, to be made without regard to the individual officer's subjective motives . . . .").[14]

In their motion papers, Defendants first argue that the 2011 and 2012 DIRs, even without more, created probable cause for the officers to conclude that Plaintiff had unlawfully imprisoned Mansour. (See Defs.' Mem. at 7-8.) Under New York Penal Law, "a person is guilty of unlawful imprisonment in the second degree when he restrains another person." N.Y. Penal. L. § 135.05.

> "Restrain" means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent and with knowledge that the restriction is unlawful. A person is so moved or confined "without consent" when such is accomplished by (a) physical force, intimidation or deception, or (b) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent person . . . .

Id. § 135.00(1). Accordingly, even if Plaintiff had substantially interfered with Mansour's liberty by intentionally confining him in their home, Plaintiff would not be guilty of unlawful

---

known to Defendant Sergeant Walsh, for example, are presumed to have been known by Defendants P.O. Patterson and P.O. Lestrade.

[14] As such, any suggestion raised by Plaintiff's submissions and the factual record that the Individual Defendants arrested her because they were irritated by her and Mansour's numerous complaints are not relevant to her false arrest claim. (See, e.g., Compl. at 2 ("[T]hey were maliciously and purposefully purporting this arrest in order to stop me from filing police reports and because I complained to . . . Sergeant Walsh on the telephone a couple of days prior to this false arrest, about one of his Officer[]s and how he treated Larry and I on 02 April 2012 . . . ."); Pl.'s Opp'n at 8 ("[T]he false arrest was purely based on his[] personal feelings and agenda.").) See also supra pages 4-5 (discussing events of April 2, 2012).

imprisonment if Mansour had voluntarily assented to the confinement, as this would have negated the lack-of-consent element of the offense.

Defendants are correct that under certain circumstances, the DIRs would have provided a reasonable basis to conclude that the complainant had been confined without consent. In the 2011 DIR, Mansour alleged: "[Plaintiff] has our window screens bolted shut and a special lock on our front [and] back door that you can lock with a key [and] you cannot open without a key. I do NOT have a key. [Plaintiff] often goes out & locks me in . . . ." (2011 DIR at 3.) Similarly, the 2012 DIR alleged: "[Plaintiff] has the key to a dead bolt lock which locks both from the inside and the outside and of which I have no control over, and . . . [Plaintiff] has all the screens on all the windows screwed-shut . . . ." (2012 DIR at 3.) If the officers' relevant knowledge had consisted solely of these allegations, Mansour's statements would have been sufficient to warrant a reasonable officer in the belief that Plaintiff had intentionally confined him to their home and that he had not consented thereto.[15]

However, the officers also knew of an ongoing conflict between Plaintiff and Mansour,[16] which should have called into question the veracity of Mansour's allegations. When an officer receives his information from a putative victim or eyewitness, probable cause is established "'unless the circumstances raise doubt as to the person's veracity.'" Fabrikant v. French, 691 F.3d 193, 216 (2d Cir. 2012) (quoting Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006)). "'The most common situation in which doubts arise is when there exists a prior relationship between the victim and the accused that gives rise to a motive for a false accusation.'"

---

[15] The officers could have also inferred that Plaintiff likely knew that the confinement was unlawful. See Krause v. Bennett, 887 F.2d 362, 371 (2d Cir. 1989) (noting that a police officer may "rely on the implications of the information known to him in assessing whether [the suspect] possessed" the knowledge required for the offense).

[16] See supra pages 2-5 (noting, inter alia, four DIRs filed by Plaintiff and Mansour, at least two of which Walsh had signed off on; Walsh's presence at the precinct on at least one occasion when reports were filed; and an outburst by P.O. Plonczynski, in Walsh's presence, regarding the "hundreds" of complaints filed by the couple, and suggesting they "get a divorce already").

DiStefano v. Sedita, No. 11-CV-1125 (MKB), 2014 WL 349251, at *4 (E.D.N.Y. Jan. 31, 2014) (quoting Mistretta v. Prokesch, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998)); see also Hart v. City of New York, No. 11-CV-4678 (RA), 2013 WL 6139648, at *5 (S.D.N.Y. Oct. 28, 2013) ("[W]here a 'bitter prior relationship exists' that is 'known to the arresting officer before the arrest is made, a complaint from the complaining victim alone may not be enough to constitute probable cause; the officer may need to investigate further.'" (citation omitted)). When there is reason to doubt the truthfulness of a complaint, the officer is required to investigate further and acquire additional information that corroborates the putative victim's statement. See DiStefano, 2014 WL 349251, at *5; Hart, 2013 WL 6139648, at *5; Williams v. City of New York, No. 02-CV-3693 (CBM), 2003 WL 22434151, at *5 (S.D.N.Y. Oct. 23, 2003).

As noted, the police officers knew that Plaintiff and Mansour's relationship was frequently hostile. Walsh had headed the Domestic Violence Unit since November 2011 (see Def. Sgt. Walsh's Resp. & Obj. to Pl.'s Interrogs. at 5 (Obj. & Resp. to Interrog. No. 7)); Plaintiff had previously filed several reports against Mansour (see Selvaggio Dep. 36:13-15; Pl.'s Opp'n at 8); the Domestic Violence Unit had visited the home three or four times (see Selvaggio Dep. at 39:19-20); and Walsh had been present at the precinct on April 2, 2012, when Plaintiff and Mansour each filed additional complaints (see id. at 31:14-16), and when P.O. Plonczynski lost patience with them for filing "hundreds of complaints" and suggested that they "get a divorce already." See supra pages 2-5. Accordingly, they had reason to doubt Mansour's motivations for filing the two DIRs and to question his truthfulness. Moreover, the officers should have doubted the veracity of any statements implying that Mansour was unable to leave his home, given that Mansour had freely done so each time he filed a DIR at the precinct. Under

17

the totality of the circumstances, the DIRs alone did not establish probable cause; further investigation was required.

Defendants note that they did conduct such an investigation. And they argue, alternatively, that the evidence obtained upon the officers' visit to Plaintiff and Mansour's residence on April 6, 2012, corroborated the information contained in the DIRs and established probable cause for Plaintiff's arrest. (See Defs.' Mem. at 9.) Specifically, the officers observed the screwed-in windows and the two locks, including a dead bolt (see Defs.' 56.1 ¶¶ 9-10, 12; Evid. Photos.), and Plaintiff admitted to Officer Walsh that Mansour did not have a key to the locks (Defs.' 56.1 ¶ 11; Pl.'s 56.1 ¶ 11; Compl. at 2). This additional information did buttress Mansour's DIRs, and momentarily provided the officers with a reasonable basis to conclude that the information contained therein was truthful. However, the court still cannot determine on the record before it that probable cause existed at the time of Plaintiff's arrest, which is when probable cause must be assessed. See Lowth v. Town of Cheektowga, 82 F.3d 563, 569 (2d Cir. 1996) ("Courts evaluating probable cause for an arrest must consider those facts available to the officer at the time of the arrest and immediately before it.").

Accepting as true Plaintiff's disputed evidence, Plaintiff and Mansour both informed the officers prior to the arrest that Mansour did not have a key because he did not want a key, and that the door was locked only when everyone in the residence went "out." (See Mansour Dep. at 48:10-13 (Mansour told Walsh that "I told my wife I don't want a copy of the key. I don't need a copy of the key. We lock I when we go out and I don't need it."); id. at 32:2-10 ("I said my wife did nothing at any time without my knowledge and without my approval."); Compl. at 2 (stating that Plaintiff explained to Walsh that Mansour did not have a key "only because he don't want one and I only lock it when we all go out").) It is not the court's role to assess the

credibility of this testimony; a jury could find that Mansour and Plaintiff made these statements. And with these statements, the probable cause created by the DIRs' corroboration would have dissipated, as Plaintiff's and Mansour's explanations not only rebutted the lack-of-consent element of the offense, but also indicated that Mansour was not confined in the home at all. See Jocks v. Tavernier, 316 F.3d 128, 135 (2d Cir. 2003) ("[U]nder some circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause."); see also Lowth, 82 F.3d at 571 (in context of malicious prosecution claim, noting that probable cause may "dissipate" where the "groundless nature of the charges [is] made apparent by the discovery of some intervening fact" (citing Callan v. State, 532 N.E.2d 96 (N.Y. 1998))).[17]

Certainly, where there is conflicting testimony from two witnesses, or from the victim and the accused, the police may choose to rely on either of the statements. See, e.g., Wieder v. City of New York, 569 F. App'x 28, 29 (2d Cir. 2014) (summary order) (finding probable cause where an officer was confronted with different stories from alleged victim and arrestee). Here, however, the accused and the victim did not give conflicting accounts. While Defendants correctly assert that an officer with a reasonable basis for believing that there is probable cause need not "explore and eliminate every theoretically plausible claim of innocence before making an arrest," Curley v. Village of Suffern, 268 F.3d 65, 70 (2d Cir. 2001), the police cannot

---

[17] Other circuits have confirmed the notion that additional evidence discovered before an arrest may vitiate probable cause, rendering the arrest unlawful. See, e.g., United States v. Oritz-Hernandez, 427 F.3d 567, 574-75 (9th Cir. 2004) (evidence supporting a finding of probable cause to believe defendant attempted to sell a controlled substance was vitiated by countervailing evidence, including a strip search of the defendant that revealed nothing incriminating, a statement by the defendant denying selling drugs, and a statement from an individual involved in the same stop denying having just purchased drugs from defendant); Bigford v. Taylor, 834 F.2d 1213, 1218 (5th Cir. 1988) (a nationwide computer search of a vehicle with a missing federal identification sticker and an apparently altered vehicle identification number ("VIN") that produced no report that the vehicle had been stolen eliminated previously established probable cause to believe the vehicle was stolen based on the missing federal sticker and apparent alteration of the VIN); BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986) ("The continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause." (citing People v. Quarles, 410 N.E.2d 497 (Ill. App. Ct. 1980) (when police were informed by landlord that defendant lived in apartment, they should have released him because they no longer had probable cause to believe that defendant had committed the offense of attempted burglary))).

"deliberately disregard" information plainly conveyed by the perceived victim that would tend to negate probable cause and "establish justification." Jocks, 316 F.3d at 136; see also Richards v. City of New York, No. 97-CV-7990 (MBM), 2003 WL 21036365, at *17 (S.D.N.Y. May 7, 2003) (holding that probable cause was not established when witness made conflicting statements both (1) identifying the plaintiff as the killer and (2) exculpating the plaintiff); Ward v. City of New York, No. 08-CV-7380 (RJH), 2010 WL 3629536, at *2 (S.D.N.Y. Sept. 17, 2010) (declining to find that probable cause was established as a matter of law where victim had given equivocal, mixed statements).

Were Mansour's DIRs and the officers' observations at the residence the only evidence known to the Defendants at the time of Plaintiff's arrest, Plaintiff's protest that she was innocent and that Mansour did not have a key only because he did not want one would not have sufficed to defeat probable cause; the officers would have had no obligation to investigate the veracity of Plaintiff's statements. However, when Mansour, the purported victim, made statements controverting the elements of the false imprisonment offense, any probable cause that previously existed dissipated. Moreover, many of Mansour's April 6, 2012, statements do not unambiguously conflict with the DIRs, and may be understood as expanding on or clarifying the DIRs and providing the officers with added information.[18] Accordingly, Mansour's pre-arrest statements would have even more forcefully vitiated probable cause. Thus, a material dispute of

---

[18] For example, Mansour stated in the 2011 DIR that Plaintiff had the window screens bolted shut and a dead bolt lock on the door, and that "I do NOT have a key. [Plaintiff] often goes out & locks me in . . . ." (2011 DIR at 3.) While the officers may have understood this to be an assertion that Mansour was confined in his home against his will, the DIR did not state this explicitly, and Mansour's April 6 statements negated the inference of lack of consent that the officers might have drawn from the DIR. (See Mansour Dep. at 48:10-13 (explaining that Mansour did not want or need a copy of the key); id. at 34:9-10 (averring that Plaintiff "did nothing at any time without my knowledge and approval").) Mansour also explained why, if not to keep him confined against his will, the screws and dead bolt had been installed—to prevent bugs from entering and intruders from breaking in. (Id. at 47:18-25.) Accordingly, Mansour's later statements clarified and expanded on the DIRs as much, if not more, than they contradicted them. Notably, if the 2011 DIR were to be excluded from evidence, and only the 2012 DIR considered, there would be no conflict at all between that DIR and Mansour's April 6 statements, as Mansour did not state in the 2012 DIR that Plaintiff ever went out and locked Mansour inside. (See 2012 DIR at 3-4.)

20

fact regarding the events leading up to the arrest—specifically, whether Plaintiff's and Mansour's accounts of those events should be credited—precludes a finding of probable cause on this motion.

### 3. Qualified Immunity

Defendants further argue that even if probable cause to arrest did not exist, the Individual Defendants are entitled to qualified immunity on Plaintiff's false arrest claim. Qualified immunity protects government officials from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). In the case of a false arrest claim, even in the absence of probable cause, an arresting officer enjoys qualified immunity from suit if there was "arguable probable cause to arrest." See Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004). Arguable probable cause exists if either: "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Id. (quoting Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991)). The concept of probable cause is the same in both the probable cause and arguable probable cause inquiries,[19] although the tests are not congruent. See Zellner v. Summerlin, 494 F.3d 344, 370 (2d Cir. 2007). Thus, the Second Circuit has clarified that arguable probable cause must "not be misunderstood to mean 'almost' probable cause." Id. (quoting Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007)); see also Jenkins, 478 F.3d at 87 ("If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer."). If "'any reasonable trier of fact could find that the

---

[19] Accordingly, as with probable cause, the court's inquiry into the existence of arguable probable cause is objective and does not consider the subjective intent or motivations of the officer. See Garcia v. Jane and John Does 1-40, No. 12-2634-cv, -- F.3d ----, 2015 WL 737758, at *5 (2d Cir. Feb. 23, 2015).

defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment.'" Dowling v. City of New York, No. 11-CV-4954 (NGG) (RML), 2013 WL 5502867, at *8 (E.D.N.Y. Sept. 30, 2013) (quoting Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995)). "An officer's actions are objectively unreasonable when no officer of reasonable competence could have made the same choice in similar circumstances." Lennon, 66 F.3d at 420-21.

Even applying this more permissive test, the court is not convinced on the factual record that the officers had arguable probable cause to arrest. In his affidavit and deposition testimony, Mansour claims that he explained to the officers at the time of Plaintiff's arrest that he did not have a key to the dead bolt lock by choice; that the lock and screwed-in windows were intended to keep bugs and intruders away; that the front door was locked only when he and Plaintiff were both out; and that Plaintiff "did nothing at any time without [his] knowledge and [his] approval." (Mansour Dep. at 34:2-10, 47:18-25, 48:10-13.) As explained above, these statements would have negated two required elements of the false imprisonment offense. Taken together with the knowledge that Mansour had freely visited the police precinct on at least two occasions, no objectively reasonable officer could have believed that there was probable cause to arrest Plaintiff. See Ward v. City of New York, No. 08-CV-7380 (RJH), 2010 WL 3629536, at *2 n.4 (S.D.N.Y. Sept. 17, 2010) (finding qualified immunity not available as a defense where the victim gave equivocal statements and no other reliable evidence pointed toward a violation); Araujo v. City of New York, No. 08-CV-3715 (KAM) (JMA), 2010 WL 1049583, at *6 (E.D.N.Y. Mar. 10, 2010) (finding no arguable probable cause where police obtained no evidence to corroborate the testimony of a seven-year-old child about events that had occurred over three years earlier); cf. Richards v. City of New York, 433 F. Supp. 2d 404, 420

(S.D.N.Y. 2006) (granting summary judgment on qualified immunity grounds despite the fact that the witness retracted the statement implicating the arrestee, due to overwhelming additional evidence that officers had gathered in their investigation). Given Mansour's statements, Plaintiff's statements, and the fact that Mansour had previously visited the precinct—notwithstanding the DIRs and the officers' observations of the window screws and dead bolt locks—a reasonable jury could find, under the circumstances, that no reasonable officer would have concluded that there was probable cause to believe Plaintiff had unlawfully imprisoned Mansour. See Lennon, 66 F.3d at 424.

### B. Excessive Force

The denial of summary judgment on Plaintiff's false arrest claim does not prevent the court from finding that summary judgment is appropriate on her excessive force claim. See Mesa v. City of New York, No. 09-CV-10464 (JPO), 2013 WL 31002, at *21-22, *31-32 (S.D.N.Y. Jan. 3, 2013) (citing Jones v. Parmley, 465 F.3d 46, 62 (2d Cir. 2006)); McCart v. Vill. of Mount Morris, No. 09-CV-6472 (MAT), 2011 WL 3421505, at *11-12 (W.D.N.Y. Aug. 4, 2011) (same). "[E]ven where there is no probable cause for arrest, and thus a viable claim for false arrest or imprisonment, the force used by the officers still could constitute objectively reasonable restraint." Mesa, 2012 WL 31002, at *31. While summary judgment on Plaintiff's false arrest claim is not warranted in this case, her excessive force claim cannot survive summary judgment. Defendants' motion for summary judgment is GRANTED on Plaintiff's claim of excessive force.

A claim that law enforcement officers used excessive force in the course of an arrest is analyzed under the Fourth Amendment reasonableness standard. See Graham v. Connor, 490 U.S. 386, 395 (1989). Under this standard, the determinative question is whether the officers'

actions were "'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. Reasonableness is judged "from the perspective of a reasonable officer on the scene," and "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." Id. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). The court considers the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (citing Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)).

Plaintiff's excessive force claim is based on tight handcuffing.[20] While the Second Circuit has not concluded that handcuffing an arrestee is per se reasonable, "it has observed that 'handcuffing will be the reasonable course in many, if not most arrest situations.'" Barratt v. Joie, No. 96-CV-0324 (LTS) (THK), 2002 WL 335014, at *7 (S.D.N.Y. Mar. 4, 2002) (quoting Soares v. Connecticut, 8 F.3d 917, 921 (2d Cir. 1993)). "Neither the Supreme Court nor the Second Circuit has established that a person has the right not to be handcuffed in the course of a particular arrest, even if he does not resist or attempt to flee." Soares, 8 F.3d at 922. Accordingly, district courts in this circuit have developed a three-prong analysis used to evaluate an excessive force claim based solely on tight handcuffing. "The court considers whether: '1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiff's] pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists.'" Wang v. Vahldieck, No. 09-

---

[20] To the extent Plaintiff attempts to assert an excessive force claim relating to her tight seatbelt, such a claim fails. Plaintiff does not allege that she suffered any injury as a result of the tight seatbelt, and Plaintiff herself unbuckled the seatbelt while in the police vehicle. Accordingly, as any force used in this context was truly de minimis, this claim is not viable. See Washpon v. Parr, 561 F. Supp. 2d 394, 407 (S.D.N.Y. 2008) ("On an excessive force claim a plaintiff must present sufficient evidence that the alleged use of force is 'objectively sufficiently serious or harmful enough' to be actionable. 'A de minimis use of force will rarely suffice to state a Constitutional claim.'" (quoting United States v. Walsh, 194 F. 3d 37, 47 (2d Cir. 1999); Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993)) (additional citation and internal quotation marks omitted)).

24

CV-3783 (ARR) (VVP), 2012 WL 119591, at *7 (E.D.N.Y. Jan. 9, 2012) (alteration in original) (quoting Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008)); see also Morgan v. City of New York, No. 12-CV-704 (WFK), 2014 WL 3407714, at *5 (E.D.N.Y. July 10, 2014); Faruki v. City of New York, No. 10-CV-9614 (LAP), 2012 WL 1085533, at *6 (S.D.N.Y. Mar. 30, 2012), aff'd, 517 F. App'x 1 (2d Cir. 2013) (summary order).

"The injury requirement is 'particularly important,'" Usavage v. Port Auth. of N.Y. and N.J., 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013) (quoting Sachs v. Cantwell, No. 10-CV-1663 (JPO), 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012)), because in order "'to be effective, handcuffs must be tight enough to prevent the arrestee's hands from slipping out.'" Abdul-Rahman v. City of New York, No. 10-CV-2778 (ILG), 2012 WL 1077762, at *7 (E.D.N.Y. Mar. 30, 2012) (quoting Esmont v. City of New York, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005)). "[T]here is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." Id. (internal quotation marks and citation omitted). "These injuries need not be 'severe or permanent,' but must be more than merely 'de minimis.'" Usavage, 932 F. Supp. 2d at 592 (quoting Vogeler v. Colbath, No. 04-CV-6071 (LMS), 2005 WL 2482549, at *9 (S.D.N.Y. Oct. 6, 2005); Washpon v. Parr, 561 F. Supp. 2d 394, 407 (S.D.N.Y. 2008)). "The most common injuries found to satisfy the injury requirement in handcuff cases are scarring and nerve damage." Id. (collecting cases).

While Plaintiff's testimony is sufficient to raise a question of fact as to the first two prongs of the test—she alleges that the handcuffs were too tight, and that she repeatedly asked the officers to loosen them, to no avail—the record does not support the existence of an injury sufficient in degree to survive summary judgment. Plaintiff testified that her injury was

"minimal," that she could not remember how long the abrasions to her wrists lasted, and that she received no medical treatment for them. (Selvaggio Dep. at 53:24, 54:14-18, 55:24-25.) In her opposition memorandum, Plaintiff contends that she experienced "scabbing that lasted approximately one week." (Pl.'s Opp'n at 27.)

In the court's view, "abrasions" and "scabbing" are interchangeable injuries, and under either formulation, the temporary, admittedly "minimal" abrasions or scabs that Plaintiff reports—for which medical treatment was found unnecessary—do not rise to the level of injury that courts in this circuit have held to satisfy the injury requirement. Cf. Morgan, 2014 WL 3407714, at *1-2, *5-6 (denying summary judgment where plaintiff, whose hands were completely numbed while handcuffed, was provided pain medication and given diagnosis of contusions and pinched nerve or nerve damage, and submitted supporting medical records); Usavage, 932 F. Supp. 2d at 596-97 (denying summary judgment where plaintiff testified as to continuing numbness and pain, which affected his lifestyle, MRI revealed inflammation consistent with compression injury, and another medical test confirmed nerve damage); Levy v. City of New York, 935 F. Supp. 2d 575, 594 (E.D.N.Y. 2013) (denying summary judgment where handcuffs caused a "very deep gouge" in wrist that took approximately one month to heal and aggravated preexisting wrist injuries); Pelayo v. Port Auth., 893 F. Supp. 2d 632, 642-43 (S.D.N.Y. 2012) (denying summary judgment where MRI revealed torn cartilage and plaintiff needed several weeks of physical therapy, missing at least one day of work); Washpon, 561 F. Supp. 2d at 401, 407-08 (denying summary judgment where plaintiff received tetanus shot at hospital following removal of handcuffs and testified to having permanent scarring); Golio v. City of White Plains, 459 F. Supp. 2d 259, 265 (S.D.N.Y. 2006) (denying motion to dismiss where plaintiff alleged he was handcuffed so tightly that his hands were visibly swollen and

26

discolored, causing permanent nerve damage); Gonzalez v. City of New York, No. 98-CV-3084 (ILG), 2000 WL 516682, at *4-5 (E.D.N.Y. Mar. 7, 2000) (denying summary judgment where plaintiff underwent physical therapy for wrist injuries and had medical expert testify that he continued to suffer nerve damage two years after incident); Clarke v. City of New York, Nos. 96-CV-5762 (ERK), 98-CV-7297 (ERK), 1999 WL 608857, at *12-13 (E.D.N.Y. July 22, 1999) (denying summary judgment where plaintiff, who alleged that she was handcuffed behind her back for 23-hour period, claimed serious physical injuries to neck, arms, and shoulders).

With no additional allegations of force beyond the handcuffing,[21] Plaintiff has presented no evidence of an unreasonable use of force by the Defendants. The court finds that the abrasions experienced by Plaintiff as a result of tight handcuffing are de minimis injuries, and that the minimal degree of injury warrants summary judgment on her excessive force claim. See Lemmo v. McKoy, No. 08-CV-4264 (RJD), 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011) ("Injuries held to be de minimis for purposes of defeating excessive force claims include short-term pain, swelling, and bruising, brief numbness from tight handcuffing, claims of minor discomfort from tight handcuffing, and two superficial scratches with a cut inside the mouth." (internal citations omitted) (collecting cases)); see also Faruki, 2012 WL 1085533, at *6-7 (holding that allegations of bruising and photographs of redness and swelling were not sufficient

---

[21] Cf. Bender v. City of New York, No. 09-CV-3286 (BSJ), 2011 WL 4344203, at *6 (S.D.N.Y. Sept. 14, 2011) (dismissing excessive force claims premised on tight handcuffing where only alleged injury was indentation lasting six hours, but denying motion to dismiss as to claim that officer unnecessarily yanked plaintiff's thumb after she was handcuffed); Lemmo v. McKoy, No. 08-CV-4264 (RJD), 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011) (denying summary judgment although injuries were relatively minor, due to evidence of gratuitous twisting of plaintiff's thumbs when he was already handcuffed and in a cell); Lucky v. City of New York, No. 03-CV-1983 (DLC), 2004 WL 2088557, at *7 (S.D.N.Y. Sept. 20, 2004) (denying summary judgment where, in addition to allegations of red marks left on wrists from tight handcuffs, plaintiff testified that he had also been shoved into police car, injuring shoulder), aff'd, 140 F. App'x 301 (2d Cir. 2005) (summary order); Simpson v. Saroff, 741 F. Supp. 1073, 1078 (S.D.N.Y. 1990) (denying motion for summary judgment where, in addition to allegations of swollen and bleeding wrists from tight handcuffs, resulting in a faint scar, evidence existed that plaintiff was also punched in stomach during arrest).

to support a constitutional violation, and granting summary judgment because allegations of a hairline fracture and nerve damage were not supported by any evidence in the record); Sachs v. Cantwell, No. 10-CV-1663 (JPO), 2012 WL 3822220, at *14-15 (S.D.N.Y. Sept. 4, 2012) (granting summary judgment on tight handcuffing claim where plaintiff experienced 24 hours of swelling and went to hospital but no treatment was provided for wrists); Wang, 2012 WL 119591, at *7 (granting summary judgment where plaintiff was "shrieking in pain" from tight handcuffs but plaintiff sought no medical attention and there was no evidence that the handcuffing caused actual physical injury); Abdul-Rahman, 2012 WL 1077762, at *7-8 (granting motion for judgment on the pleadings where only alleged injury was numbness and marks on wrists); Bender v. City of New York, No. 09-CV-3286 (BSJ), 2011 WL 4344203, at *6 (S.D.N.Y. Sept. 14, 2011) (holding that "extremely tight" handcuffing for nearly fourteen hours that left indentations in plaintiff's arms for over six hours did not amount to excessive force); Richardson v. N.Y.C. Health & Hosps. Corp., No. 05-CV-6278 (RJS), 2009 WL 804096, at *10-14 (S.D.N.Y. Mar. 25, 2009) (granting summary judgment where plaintiff experienced pain, bruises, swelling, and red marks, and was given an over-the-counter pain reliever at the hospital, because injury was insufficient to permit a jury to conclude that the handcuffing had involved an unreasonable use of force); Bratton v. N.Y. Div. of Parole, No. 05-CV-950 (NAM), 2008 WL 1766744, at *9-10 (N.D.N.Y. Apr. 14, 2008) (granting summary judgment where jail infirmary nurse noted swelling and tenderness of plaintiff's forearms both immediately after arrest and several weeks later, where nurse determined that the injury did not warrant medical treatment); Esmont, 371 F. Supp. 2d at 213-15 (granting summary judgment on tight handcuffing claim where plaintiff sought treatment for bruising and swelling, and wore a "half-cast" provided by doctor for one week; although plaintiff claimed permanent diminished use of hand, plaintiff

sought no further medical treatment and provided no medical evidence supporting her claim, and original hospital report indicated lack of fracture or soft tissue damage); Barratt, 2002 WL 335014, at *7 (granting summary judgment on excessive force claim where plaintiff claimed that too-tight handcuffs embedded in his wrists and resulted in bruising).

Alternatively, the Individual Defendants are entitled to qualified immunity on Plaintiff's excessive force claim. "[I]n the context of excessive force, the Fourth Amendment reasonableness inquiry tends to converge with the qualified immunity reasonableness inquiry." Wang, 2012 WL 119591, at *11 (citing Cowan v. Breen, 352 F.3d 756, 764 & n.7 (2d Cir. 2003)). Defendants did not violate any "clearly established rights" in handcuffing Plaintiff, Soares, 8 F.3d at 922, and due to the de minimis nature of Plaintiff's injury, "officers of reasonable competence could disagree," at the very least, whether the degree of tightness was reasonable, Lennon, 66 F.3d at 420. See Richardson v. Providence, No. 09-CV-4647 (ARR) (LB), 2011 WL 3701887, at *7 (E.D.N.Y. Aug. 20, 2011) ("In light of the court's conclusion that [the defendant] did not use excessive force against plaintiff, the court necessarily also holds that he is entitled to qualified immunity with respect to this conduct.").

## C. Municipal Liability

In her Rule 56.1 Statement, Plaintiff asserts that she "is suing the City of New York because they failed to properly train and supervise Sergeant Walsh, Officer Patterson and Officer Lestrade." (Pl.'s 56.1 ¶ 23.) In her opposition memorandum, Plaintiff contends that the City is liable for her alleged false arrest because it "failed to make sure [Walsh, Patterson, and Lestrade] received continuous training." (Pl.'s Opp'n at 32.) Defendants argue that Plaintiff's claims against the City should not survive summary judgment because she has not—and cannot—come

forward with any admissible evidence supporting her allegations. (Defs.' Mem. at 15-17; Defs.' Reply at 13-15.)

A municipality may be held liable under 42 U.S.C. § 1983 only if the constitutional violation at issue results from the municipality's official policy. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Such a policy may be (1) an express policy, (2) "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law,'" City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970)), or (3) a decision by a person with "final policymaking authority," see Praprotnik, 485 U.S. at 123; Pembaur v. City of Cincinnati, 475 U.S. 469 (1986). A municipality's failure to train employees can give rise to Monell liability, as can a municipality's failure to monitor or supervise employees. However, under either of these theories, Plaintiff's Monell claim cannot survive summary judgment; accordingly, summary judgment on Plaintiff's Monell claim is GRANTED.

> 1.  Failure to Train

Plaintiff's first theory of Monell liability is a failure to train. "[A] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy" only if the failure to train "amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (second alteration in original) (quoting Canton v. Harris, 489 U.S. 378, 388 (1989)). Deliberate indifference is a "stringent standard of fault," which requires "'proof that a municipal actor disregarded a known or obvious consequence'" of the particular failure in training. Id. at 1360 (quoting Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997)). "A pattern of similar constitutional violations

by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Id. (quoting Bryan Cnty., 520 U.S. at 409); see also King v. City of New York, Nos. 12-CV-2344 (NGG) (RER), 13-CV-0037 (NGG) (RER), 2014 WL 4954621, at *12 (E.D.N.Y. Sept. 30, 2014) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." (internal quotation marks and citation omitted)). The Supreme Court has cautioned that a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, 131 S. Ct. at 1359.

Upon review of the entire record submitted on this motion, there is no evidence to support Plaintiff's failure-to-train claim with respect to her alleged false arrest.[22] Plaintiff's allegation that the City failed to train the officers is entirely conclusory; she does not specify what type of training the officers lacked, and there are no facts in the record that would allow a jury to infer that a lack of training caused her injury, or that the City's alleged failure amounted to deliberate indifference. See Chiaro v. Cnty. of Nassau, No. 09-CV-3702 (SJF) (AKT), 2011 WL 3701804, at *6 (E.D.N.Y. July 29, 2011) (report and recommendation) (granting summary judgment where plaintiff failed to identify a deficiency in training or proffer evidence that inadequate training was the actual cause of his injury), adopted, 2011 WL 3702110 (E.D.N.Y. Aug. 23, 2011), aff'd, 488 F. App'x 518 (2d Cir. 2012) (summary order).

---

[22] Having found that Plaintiff's excessive force claim is not viable, she cannot sustain a Monell claim for excessive force. See Johnson v. City of New York, 551 F. App'x 14 (2d Cir. 2014) (summary order) ("Because [plaintiff] has not alleged a valid underlying constitutional deprivation, his claim against New York City pursuant to Monell . . . must also fail." (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986))); Lozada v. City of New York, No. 12-CV-0038 (ILG) (JMA), 2013 WL 3934998, at *7 (E.D.N.Y. July 29, 2013) ("When there is no underlying constitutional violation, there can be no liability under Monell." (internal quotation marks and citation omitted)). Nonetheless, even if Plaintiff did suffer a viable constitutional injury due to the use of excessive force, her excessive force Monell claim fails for the same reasons as does her false arrest Monell claim. Namely, her conclusory allegations are insufficient, and she has not put forward any facts suggesting deliberate indifference in connection with a policy of inadequate training or supervision which led to the Individual Defendants' use of excessive force.

Plaintiff's conclusory allegations cannot even survive a motion to dismiss, let alone summary judgment. See King, 2014 WL 4954621, at *34 (dismissing Monell claim because "'the simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy caused the plaintiff's injury'" (quoting Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993))); Lozada v. City of New York, No. 12-CV-0038 (ILG) (JMA), 2013 WL 3934998, at *7 (E.D.N.Y. July 29, 2013) (dismissing Monell claim as conclusory where plaintiff failed to "provide any facts that would allow the court to infer what city policies, practices, or customs contributed to or caused the deficiency" (internal quotation marks and citation omitted)).

## 2.    Failure to Supervise

Plaintiff also raises a failure-to-supervise claim against the City. As with her failure-to-discipline theory, Plaintiff's failure-to-supervise theory requires her to establish that the City acted with deliberate indifference. See Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 127-28 (2d Cir. 2004); Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995). "To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious." Vann, 72 F.3d at 1049. "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." Id.; see also Amnesty Am., 361 F.3d at 128 (holding that failure-to-supervise liability requires that the City "had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' and the policymaker's failure to

investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction").[23]

Plaintiff submitted the three Individual Defendants' CCRB and IAB disciplinary records in opposition to Defendants' motion (see generally Discip. Records), and although she does not raise such an argument in her briefing, the court construes her papers to contend that the officers' disciplinary history should have put the City on notice of a "potentially serious problem of unconstitutional conduct." Amnesty Am., 361 F.3d at 128. However, the information contained therein does not sustain a Monell claim. The only allegation that appears to involve an arrest potentially made without probable cause is a single disputed arrest allegation brought against Defendant P.O. Lestrade in July 2006. (Discip. Records at 13.) This isolated incident does not amount to the "repeated complaints of civil rights violations" that have been held sufficient to establish an "obvious" need for increased supervision.[24] Vann, 72 F.3d at 1049. Compare Ricciuti v. N.Y. Transit Auth., 941 F.2d 119, 121, 124 (2d Cir. 1991) (holding "a dozen or more instances of alleged, conceded, or adjudicated improper arrests" over fourteen-year-period, including nine instances in the five years leading up to plaintiff's contested arrest, sufficient to withstand motion to dismiss), and Fiacco v. City of Rensselaer, N.Y., 783 F.2d 319, 331 (2d Cir. 1986) (holding five complaints of excessive force over twenty-two-month period sufficient to sustain jury verdict), with Seri v. Town of Newtown, 573 F. Supp. 2d 661, 669 (D. Conn. 2008) (holding that municipality could not be liable on failure-to-supervise theory where police officer

---

[23] "Deliberate indifference may also be shown through expert testimony that a practice condoned by the defendant municipality was 'contrary to the practice of most police departments' and was 'particularly dangerous' because it presented an unusually high risk that constitutional rights would be violated." Vann, 72 F.3d at 1049 (quoting Dodd v. City of Norwich, 827 F.2d 1, 4-6 (2d Cir.), modified on reh'g on other grounds, 827 F.2d 1, 7 (2d Cir. 1987)). No such evidence has been put forward in this case.

[24] Although a single disciplinary failure can support an inference of deliberate indifference under certain circumstances, see Amnesty Am., 361 F.3d at 127, the single disputed arrest allegation in Lestrade's file, without additional information, is insufficient to establish the required notice.

had history of insubordination at prior policing job, due to "absence of any evidence showing that [the officer] was incompetently performing his job on such a consistent basis that keeping him on duty represented a deliberate indifference to the constitutional rights of its citizens"). The other allegations in the records—an off-duty arrest allegation brought against Defendant Sergeant Walsh in August 2004, an allegation of an incomplete or improper memobook made against Walsh in April 2011, an allegation of unspecified, "other" misconduct made against Walsh in April 2011, and an allegation of an incomplete or improper investigation brought against Lestrade in February 2010 (see Discip. Records at 2-6, 11-13)—do not appear on their face to involve allegations of possible civil rights violations.

Moreover, even if these five varied allegations over the course of a ten-year-period were sufficient to put the City on notice of a constitutional problem, Plaintiff has failed to come forward with evidence to suggest that the City did not meaningfully investigate the allegations; indeed, she has "presented no evidence as to the municipality's response to any prior incident of misconduct."[25] Vann, 72 F.3d at 1050 (discussing Sarus v. Rotundo, 831 F.2d 397, 401-02 (2d Cir. 1987)); see also id. (denying summary judgment where plaintiff pointed to specific deficiency in police department procedures—a lack of follow-up supervision to "problem officers" upon their return to full-time duty); Chin v. N.Y.C. Hous. Auth., 575 F. Supp. 2d 554, 567 (S.D.N.Y. 2008) (granting summary judgment where plaintiff "fail[ed] to adduce any evidence of how" municipal policymaker had responded to email purporting to provide notice of unconstitutional conduct (emphasis in original)). Accordingly, Plaintiff's failure-to-supervise claim cannot survive summary judgment.

---

[25] At least one of the allegations—Defendant Walsh's incomplete or improper memobook—was deemed substantiated after an investigation. (See Discip. Records at 2-6, 11-13.)

## IV.   CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  With regard to Plaintiff's false arrest claim, summary judgment is GRANTED in favor of the City of New York, and DENIED for the three Individual Defendants.  With regard to Plaintiff's excessive force claim, summary judgment is GRANTED in favor of all Defendants.  The Clerk of Court is respectfully directed to dismiss the City of New York from the case.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York  
     March 18, 2015

NICHOLAS G. GARAUFIS  
United States District Judge